CHARLOTTE WOMOCHIL, Appellee, v. CHARLES PETERS et al., doing business as CENTURY CAB COMPANY, Appellants.

No. 44590.

APRIL 4, 1939.

REHEARING DENIED SEPTEMBER 22, 1939.

Barnes, Chamberlain & Hanzlik, Donald P. Barnes, and Edwin H. Wardsworth, for appellee.

Comfort & Comfort, James P. Irish, and John D. Randall, for appellants.

SAGER, J.— ▪ Bradley Carlton, one of the defendants, was dismissed during the progress of the trial. Appellants complain of the dismissal but we are unable to see how they were prejudicially affected. Neither Code 1935, section 11182, nor Bruhn v. Fort Dodge St. R. Co., 195 Iowa 454, 192 N. W. 296, supports appellants at this point.

▪ The accident under investigation occurred near midnight of November 29, 1936. At that time plaintiff was riding in a taxicab owned by the defendant Peters, driven by a defendant Augustine, and operated under some agreement with appellant Ethel B. Harte, doing business under the name of Century Cab Company. This arrangement leads appellants into a discussion of the question as to who was responsible for the

accident. It is sufficient for the purposes of this opinion, to say that this was a question properly for the jury. We find here no ground for complaint.

The cab in which plaintiff was riding met in collision with a car being driven by one Donnelly. Plaintiff's version of the accident is:

"As the cab approached the intersection of First Street and Third Avenue West in the city of Cedar Rapids, Iowa, we were going I should judge around 30 or 35. It speeded up to go through the intersection. I have no recollection of the gears being shifted as we went through the intersection. When we came into the intersection the other car was coming down First Street and that is the last thing I can remember. The other car was to the right coming down First Street. That was when we just about middle way through the intersection by the signal post."

On cross-examination this appears:

"I didn't see the Donnelly car until an instant before the accident. At that time the cab was just about by the signal and the signal is approximately in the center of the intersection. I don't know whether Augustine slowed down when he approached the intersection or not. I don't remember whether or not he shifted gears."

Defendant Augustine testified:

"The brakes of the cab were in good order on the night of November 29, 1936. I do not know how long since they had been tested but they were in good condition. At twenty miles an hour that car could be stopped in approximately ten feet. At thirty miles per hour it would take approximately twenty feet."

Why there should not have been more testimony from this witness will appear later.

Donnelly, driver of the other car involved, testified for plaintiff on direct examination:

"As I approached the intersection of Third Avenue and First Street West, I was going between twenty and twenty-five miles an hour. As I approached that intersection I saw the

lights of a car shining into the intersection. When I first saw the car I was heading in the intersection. The car was coming from the east. The car was just coming into the intersection at that time, too. I would judge he was going about thirty-five miles an hour. We both got there about the same time as he was traveling about thirty-five miles an hour, and to avoid having an accident I swerved to the left to try to miss him. And my right front fender hit his right rear fender, and it scooted him across the street, and when he stopped he was in front of the bank on Third Avenue in front of the Peoples Savings Bank. He was turned almost around. He was headed in a northeasterly direction. There is a stop light in the middle of that intersection. His back end was clearing that light when I came in contact with the taxi cab. His car was to the right of the stop light when I struck it. His back end when I hit it just missed that pole in the middle of the street. * * * The taxi-cab was coming into the intersection just about the same time I was. He might have been there just a little ahead of me. I don't think so, though. He was going faster than I was.''

On cross-examination he said further:

''I was ten or fifteen feet back from the north curb line of Third Avenue when I first saw the lights of the car that I subsequently learned was the taxicab. I couldn't see anything but the lights of the car at that time. There wasn't anything that obstructed my view but I just didn't see the car. The first time I saw the car he was in the intersection there and I seen I couldn't stop. When I first saw this other car the front end of my car was about even with the north curb line of Third Avenue if it had been extended. At that time he was in the intersection—about half a car length. To the best of my judgment the stop light is approximately in the center of the intersection. The taxicab traveled fifteen or twenty feet after I first saw him. The brakes on my car were all right the night of the accident. I could stop that type of car in about ten to twelve feet going twenty miles an hour. (Witness admits that he had four 'drinks' of gin that evening before the accident.)

''When I was ten feet north, maybe not that far, of the intersection of Third Avenue and First Street, I looked and saw the lights of the cab but did not see the cab itself. At

the time of the actual collision the rear end of the cab was to the west of the center post in the intersection. I do not know how far west but it cleared it when I hit it.''

Cross-examination left some uncertainty as to just what the witnesses intended to say, but the weight and credibility thereof were for the jury. While we have not attempted to give the testimony in full, the quoted portions convey a fair understanding of the case as a whole.

The court submitted plaintiff's charges of negligence in particulars, which we summarize: Excessive speed; speed in excess of that permitted by statute; failure to have the car in control; failure to reduce speed when approaching an intersection, this in violation of the city ordinance; a failure to keep a lookout; and failure to yield the right of way.

■ Appellants further assert that the court was unduly strict in limiting the cross-examination of Augustine when he was called as a witness by the appellee. This witness being a defendant might well be regarded as hostile to the plaintiff's cause and the court rightly limited the cross-examination to matters brought out on direct.

■ One of the claims most vigorously pressed by the appellants is that the court should have directed a verdict on the ground, generally stated, that the evidence failed to show any negligence which was the proximate cause of plaintiff's injury, and that the record conclusively shows that the accident was due to the negligence of Donnelly. With this we do not agree. The question as to how the accident occurred and as to whose fault it was, was strictly for the jury. Appellants' citations to this point do not bear them out. Two of them, Hartman v. Red Ball Transportation Co., 211 Iowa 64, 233 N. W. 23; Shuck v. Keefe, 205 Iowa 365, 218 N. W. 31, are rather against, than for them.

■ Appellants claim that the court erred in submitting the specifications of negligence it did, except that they admit the question of excessive speed was in the case. The record is such that the jury might have found that the defendants were negligent in the particulars submitted. Appellants' complaint based on the court's refusal to give the requested instructions is without merit. These might well have been given, but the subject

matter thereof was covered by those given on the court's own motion.

■ On the authority of Carpenter v. Wolfe, 223 Iowa 417, 273 N. W. 169, appellants contend that there was error in submitting to the jury the provision of the city ordinance with reference to control and speed of the cab. This ordinance merely embodies the provisions of Code 1935, section 5031 (3), and we are unable to read in the language of Stiger, J., in that opinion, any support for appellants.

■ It is next insisted that there was error in giving an instruction (No. 8), which held the defendants to the liability of a common carrier of passenger for hire. Among others the court gave this instruction (No. 12): "You are instructed that a common carrier of passengers undertakes for hire to carry all persons indifferently who may apply for passage, so long as there is room and there is no legal excuse for refusing."

But appellants say that the court did not require them in instruction No. 8 to first find that the defendants were common carriers. This objection is not good for two reasons: First, there could scarcely be any question of the relationship of carrier and passenger; and second, instruction No. 13 expressly made this high degree of care dependent on a finding that the defendants were in fact common carriers for hire. The court's instructions read together are supported by Kliebenstein v. Iowa R. & L. Co., 193 Iowa 892, 895, 188 N. W. 129, 130, where we said:

"That a carrier of passengers for hire must exercise more than ordinary diligence in the protection of its passengers is a rule well established. The carrier's duty stops just short of insuring the safety of the passenger, and the common expressions of the law on this subject are that the carrier is bound to protect the passenger as far as human care and foresight will go, and that the carrier is liable for slight negligence."

■ During the trial an incident occurred which affords the basis of appellants' insistence that the court was in error in this instance at least. The defendant Augustine had been called as a witness by the plaintiff, and as stated above, the defendants' cross-examination was held to the matters brought out on direct. This strictness, they say, made error where perhaps it

might have been avoided if more liberality had been shown. Augustine was called by plaintiff. This happened:

After the plaintiff rested, appellants called defendant Augustine as their witness. His direct examination was completed and his cross-examination had been fairly started when a question arose as to the proper identification of an exhibit. Objection being made, the court suggested that preliminary proof should come from the person who prepared the exhibit. Augustine was asked to stand aside, and another witness examined. By this time the court had reached the usual time for adjournment. A recess was taken (this being Friday afternoon) until the following Monday at nine o'clock. It was understood by all parties, though perhaps not expressly stated, that Augustine would be on hand for further cross-examination. He did not appear. Time was given until 1:30 o'clock of the same day to locate him. Diligent search by defendants' attorney failed to discover his whereabouts. The court found (and in this finding we agree) that the absence of the witness was not in any way attributable to fault on the part of defendants. Plaintiff moved to strike the testimony of Augustine for the reason that they had been denied the right of full cross-examination. The ruling of the court sustaining this motion is strenuously urged as error. Strangely, this question, in the precise form it arises here, has not been before the courts very frequently. Appellee cites the Michigan case referred to below and independent investigation has disclosed little additional law on the subject. What there is sustains the court in its ruling. See Sperry v. Estate of Franklin Moore, 42 Mich. 353, 4 N. W. 13. Note to Wray v. State of Alabama, 15 L. R. A. (N. S.) 493. In the case of Kemble v. Lyons, 184 Iowa 804, 169 N. W. 117, Evans, J., speaking for the court, laid down the rule that under such circumstances the direct examination should be excluded.

■ Other errors are urged but what we have said disposes of such as need specific attention except one, and that is the matter of excessive damages. Appellants urgently insist that the verdict ($3,500) was so excessive as to indicate such passion and prejudice as to entitle them to a new trial. Doctor Beardsley examined the plaintiff shortly after the accident. She was then cold and suffering from shock . Her shoulder was contused and the collar bone broken. There was a great deal of pain and her condition almost hysterical. She was in the hospital

until about the first of January. An adhesive strap was attached to the shoulder to immobilize it, and appellee was kept flat on her back as near as possible while in the hospital. She was out of work eight or ten weeks. She was last examined by Doctor Beardsley in October 1937. Her injuries were healed though she complained of pain. This doctor sums up her condition at that time as follows:

"I think that she has a very good result in her collar bone. I think it is very good. She has just a small callous there and I think it is a very good result. There is a slight limitation of motion in her right arm and shoulder and then she complained of a great deal of pain in the movement. The X-ray shows that the bones are in good position and alignment."

He added that if at the time this examination was made she was suffering pain, "it was possible she would continue to suffer pain in the future." Appellants' X-ray specialist, who examined plaintiff at the same time, said that his examination showed the clavicle healed and in good alignment and with no restriction of movement of the joint. Plaintiff's own testimony elaborated on her pain and disability. She went to work in about three months.

The verdict of the jury was nearly three thousand dollars ($3,000) above the damages subject to calculation. Appellants say that this is excessive. As supporting their respective contentions, appellants cite Duncan v. Rhomberg, 212 Iowa 389, 236 N. W. 638; Tissue v. Durin, 216 Iowa 709, 246 N. W. 806; and appellee, Larkin v. Chicago & G. W. Ry. Co., 118 Iowa 652, 92 N. W. 891; Bridenstine v. Iowa City Elec. R. Co., 181 Iowa 1124, 165 N. W. 435. Citations are of little help because each case turns on its own facts, but on the whole record we are satisfied that the verdict and judgment are excessive. The injuries here do not appear as severe as they were in Duncan v. Rhomberg, in which the trial court had reduced the verdict by one thousand dollars ($1,000) and which reduction we sustained.

We are satisfied that a verdict of twenty-five hundred dollars ($2,500) would fully cover all damages which the plaintiff suffered and we conclude that unless she remits one thousand dollars ($1,000) from the judgment within thirty days after

filing this opinion, judgment should be reversed; otherwise, as modified it will be affirmed.—Affirmed on condition.

MITCHELL, C. J., and STIGER, OLIVER, HALE, BLISS, RICH· ARDS, HAMILTON, and MILLER, JJ., concur.