CHARLES C. MURRAY, appellee, v. CEDAR RAPIDS CITY LINES, INC., appellant.

No. 47863.

(Reported in 48 N.W. 2d 256)

June 5, 1951.

Barnes, Wadsworth, Elderkin & Locher and Thomas H. Pirnie, all of Cedar Rapids, for appellant.

Jordan & Jordan, L. D. Dennis and John R. Mackenzie, all of Cedar Rapids, for appellee.

Smith, J.—The case was tried twice. The first jury disagreed; the second returned a verdict for plaintiff upon which the court entered judgment, overruling defendant's motion for judgment notwithstanding verdict. Defendant has appealed.

The basic facts are not seriously in dispute. Defendant operates a city bus system in Cedar Rapids. On May 16, 1946, at about ten p.m., plaintiff concededly became a passenger on one of its buses and sat opposite the rear door. This was at First Avenue and Second Street. He continued on the bus until it reached the point where the injury occurred, on Fourth Avenue where Ninth Street would intersect if extended.

Various errors are assigned and propositions argued but the

decision must ultimately turn on the sufficiency of the evidence to go to the jury tending to establish: (1) Plaintiff's continued status as a passenger when injured, and (2) defendant's failure to exercise the required high degree of care for plaintiff's safety as such passenger.

At Third Avenue and Third Street a number of persons boarded the bus including two teen-age boys who were talking in loud voice and using profane and vulgar language. Witnesses say they were so engaged before entering the bus and that they were unsteady on their feet and making clumsy efforts to light cigarettes. According to a woman witness who got on the bus at the same corner where they entered it, they were drinking spiked coke—"that is a coke with whiskey in it"—while still on the sidewalk. She says after they deposited their fare they stood in the way of other passengers entering and when the driver asked them to "step back, please" they told him to "go to hell and mind your own business." When he told them to sit down or get off the bus they profanely demanded their money back. They were free with the epithet, "s—o—b—", addressed to each other, at least.

This same witness said that although there were women close by, the boys announced "they were going * * * to keep on drinking and if these G—d d—n people didn't like it they knew what they could do"; also, "if the bus driver didn't like it he knew what he could do." When a man passenger tried to quiet them they told him, "Shut your mouth you damned old bastard."

We are of course viewing the evidence in the light most favorable to plaintiff in considering defendant's demands for directed verdict and for judgment notwithstanding verdict. If there was any substantial evidence to support a verdict for plaintiff any contradictions and conflicts were for the jury to resolve.

According to plaintiff's version, just after the bus, traveling east on Fourth Avenue, passed Eighth Street, and just after the hoodlums insulted the man who tried to calm them down, the driver pulled over to the curb, stopped the bus, opened the front door, asked the passengers to close the doors and keep the boys on the bus, and went out in search of the police.

The man who had just incurred the boys' wrath tried to

follow the departing driver's direction but pulled the wrong lever and opened the back door, leaving the front door partly open. Plaintiff stepped quickly out the back door: "I wanted to get off the bus and not be locked in with two drunks." While there is some argument on the point, the jury could find the boys were still aboard when plaintiff left the driverless bus.

Almost at once other passengers (though not all) also left the bus, including the boys who were the cause of the trouble. There was then some trouble and scuffling on the sidewalk near the front end of the bus, apparently due to the effort of some of the men to restrain the boys pending return of the driver with the police.

Plaintiff denies taking any part in the altercation and there is no evidence he did—only a written statement by one of his witnesses, offered on cross-examination for impeachment purposes only, and repudiated in that respect by the witness himself.

Plaintiff testifies. one of the boys broke loose during the meleé and "while I had my head turned looking at him I received a blow on the side of the head which buckled my glasses into my eye." He seems to have been the typical "innocent bystander" who so frequently gets hurt.

When the bus driver returned (without the police) he caused plaintiff to be returned to the bus and taken to the hospital. There is no controversy over the seriousness of plaintiff's injury or over the amount of the verdict. He lost his eye completely and undoubtedly suffered much pain and was put to much expense and loss of time.

I. Our first proposition concerns plaintiff's claimed status as a passenger when he suffered the injury. Defendant argues that when plaintiff left the bus the relationship of passenger and carrier at once terminated and that defendant no longer owed plaintiff "the high duty which the law imposes upon common carriers", citing the opinion in Chesley v. Waterloo, C.F. & N.R. Co., 188 Iowa 1004, 176 N.W. 961, 12 A. L. R. 1366.

There is no indication in the opinion in the Chesley case that plaintiff there left the streetcar with any intention except of severing the relationship of passenger and carrier. The car was halted momentarily by some congestion of traffic. Plaintiff elected to leave the car and go his way afoot. He was struck by

a passing automobile. The charge of negligence against the carrier was in permitting him to alight at a dangerous and unusual stopping place.

Manifestly the cited case is not pertinent here. The jury here could properly find that plaintiff left the bus temporarily only and with no intention of not continuing to his destination, just as did many others of the passengers. It is certain he had not reached his originally intended destination. The bus did not stop on his or any other passenger's signal. It was not even a regular stopping place. The bus driver testifies that when he returned to the bus and loaded plaintiff on to take him to the hospital the passengers (many, if not all) returned to the bus; and that he resumed his route after leaving the hospital and distributed them to their respective destinations.

■■■ "A temporary departure * * * from the train or car for any good or reasonable cause, without an intention to abandon transportation, does not terminate the relation." 13 C. J. S., Carriers, section 566a.

"Whether the passenger alights for his own convenience from motives of either business or curiosity, or to obtain exercise at any regular stopping place for passengers, is immaterial in this respect provided that he properly regards all the carrier's rules * * *." 10 Am. Jur., Carriers, section 1012.

Our own decision in Gannon v. Chicago, R. I. & P. Ry. Co., 141 Iowa 37, 40, 117 N.W. 966, announced practically the same doctrine embodied in the foregoing quotations. See also recent approval of rule in McBroom v. S.E. Greyhound Lines, 29 Tenn. App. 13, 193 S.W.2d 92, 95.

The other cases cited by defendant seem to be as inapplicable here as is the Chesley case, supra.

In Morris v. Omaha & C. B. St. Ry. Co., 193 Iowa 616, 187 N.W. 510, plaintiff was injured by a fall in the street as she left the streetcar at a point designated by her. Directed verdict was upheld. In Fitzgerald v. Des Moines City Ry. Co., 201 Iowa 1302, 207 N.W. 602, it was held to be a jury question whether opening the exit door after a stop on signal constituted an invitation to plaintiff to alight before the car came to a full stop. MacLearn v. Iowa Southern Util. Co., 212 Iowa 555, 234 N.W. 851, merely upheld a directed verdict where plaintiff's intestate

was permitted to alight in the middle (instead of the near side) of a smoothly paved street where she was struck by an automobile. In Moss v. Mason City & C.L.R. Co., 217 Iowa 354, 251 N.W. 627, it was held plaintiff's intestate had not yet become a passenger when killed, though she was approaching for the purpose of becoming one.

None of these decisions cited by defendant touches the principle involved here. Gradert v. Chicago & N.W. Ry. Co., 109 Iowa 547, 80 N.W. 559, is more nearly in point. It sustains the proposition that if a passenger leaves the car to avoid a threatened danger and is nevertheless injured in so doing, the jury may find he was still a passenger when the injury occurred.

II. Defendant argues that even though a passenger by voluntarily leaving the car at a place not a regular stop may not completely lose his status as a passenger, he nevertheless surrenders it temporarily or, as said in argument, it becomes suspended for the time he is not actually on the vehicle.

Defendant cites 10 C. J. 629 and 13 C. J. S. 1076 (Carriers, section 566b). These texts cite cases to support the general proposition but there are significant qualifications: "* * * unless he so leaves the car on the express or implied invitation of the carrier for some necessary purpose incident to the journey, such as for the purpose of going around a wreck * * * and taking another train or car." (Idem., page 1077.)

The instant case might well be found by the jury to come within an analogous exception. It could be found the driver temporarily abandoned the bus intending that the passengers remain inside with the doors locked so the offending youths could not escape while he went for police help to handle the situation. He testifies as much.

Had defendant the right to impose this situation upon its passengers under penalty of losing their status if they stepped outside when they had opportunity? If plaintiff had remained inside without the driver's potential protection and in that position been attacked on the bus by his rioting fellow passengers, his continuing status as a passenger and the continuing duty of the carrier for his safety would have been unquestionable. The fact that he elected to seek safety, temporarily, outside should

not be said, as a matter of law, to have suspended the relationship. Whether that was really his purpose in leaving the bus was for the jury to determine. There was ample evidence to make it a jury question.

■ ■ III. Nor can we say as a matter of law that defendant met its high duty of safeguarding its passengers. The degree of care required of carriers of passengers has been too often defined in almost countless cases to require restatement here.

The statement in Klicbenstein v. Iowa Railway & Light Co., 193 Iowa 892, 895, 188 N.W. 129, 130, fortified by citation of earlier decisions, and since quoted approvingly in Womochil v. Peters, 226 Iowa 924, 929, 285 N.W. 151, seems to be comprehensive and exact: "That a carrier of passengers for hire must exercise more than ordinary diligence in the protection of its passengers is a rule well-established. The carrier's duty stops just short of insuring the safety of the passenger, and the common expressions of the law on this subject are that the carrier is bound to protect the passenger as far as human care and foresight will go, and that the carrier is liable for slight negligence."

A common and proper qualification of the rule under its various statements is that it applies only to dangers which reasonably and naturally may be anticipated. 13 C. J. S., Carriers, section 678b. But even this qualification exacts protection from any danger *which human care and foresight could reasonably anticipate.* Weber v. Chicago, R. I. & P. R. Co., 175 Iowa 358, 364, 151 N.W. 852, L. R. A. 1918A 626. That is, the high degree of care must be exercised in *foreseeing,* as well as in *guarding against,* danger. The rule is, of course, subject to the further qualification that the required care must be such as not to prevent the practical performance of the carrier's duty to transport with expedition in accordance with the usual requirements of the business.

The situation becomes more complex when it involves the duty of safeguarding the passenger against assault by a fellow passenger. In such event the difficulty of anticipating as well as of safeguarding against possible danger becomes greater.

But the question remains one for the jury, where there is testimony to appraise. In Felton v. Chicago, R. I. & P. Ry. Co., 69 Iowa 577, 29 N.W. 618, the jury found specially the defend-

ant had no reason to anticipate the assault and we held the verdict should have been for defendant.

In Starr v. Chicago, B. & Q. R. Co., 156 Iowa 311, 136 N.W. 524, the jury found the conduct of plaintiff's fellow passengers and assailants was such that the defendant carrier ought reasonably to have foreseen the possibility of the assault and we upheld the verdict and judgment for plaintiff.

The question here is whether the evidence was such as to make it a jury question, since no complaint is made as to the form of the instructions.

We appreciate the difficult position in which defendant's driver was placed. The evidence is such that the jury might have found it was even more difficult than he realized, or at least than he, as a witness, admitted. We have already sketched the testimony as to the conduct of these rowdies. They are described as about fifteen and sixteen years old, the older four feet, five or six inches tall, the younger much taller. Yet there is testimony that one boasted he had just got out of the Army.

The driver's own account of their conduct from the time they boarded the car until he acted to terminate the situation is somewhat at variance with testimony of other witnesses. If these witnesses are to be believed the operator of the bus must have been unobserving when he should have been alert. At least, the jury could find he did not exercise the highest degree of care reasonably possible. He disclaims noticing the boys when they got on the bus though other testimony describes how they obstructed the way of other passengers and told him to "go to hell and mind your own business" when he asked them to "step back, please."

Although under all the testimony the boys remained at the front part of the car the driver seems to have heard little of the commotion and the profane and vulgar language testified to by plaintiff and other witnesses. Whether their testimony was true was for the jury.

There is testimony that when the driver told the boys to sit down or get off they, or one of them, said "Give me my G—d d—n nickel back and I will get off this bus" and the operator said "You will not get your nickel back, go sit down."

There is testimony one of the boys burned a woman pas-

senger in trying to light·his cigarette. The operator disclaims knowing of it, but if it happened, and again the testimony was for the jury, it was also for the jury to determine whether the driver knew it or in the exercise of care should have known it.

It seems clear the situation called for action by the bus operator to protect the other passengers from injury and annoyance. The boys were quarrelsome and a menace to the safety and comfort of all. The belated action finally taken by the operator confirms it.

But did he act with care when he did act? That is not a question of law. If the driver could later depart from his route to go to the hospital, he could, by the same token, have driven to the police station with the young rioters and have turned them over with little delay. Other courses might suggest themselves as safer alternatives than leaving the bus unguarded with plaintiff and other innocent passengers shut in with drunken and dangerous youths whose capacity for causing injury and probable disposition for doing so might reasonably have been anticipated. In fact, under the testimony it could be found the young outlaws offered to leave the "damned old bus" upon refund of the fare they had paid. The jury could consider that.

But it is not for us to determine what would have been the proper course. It was for the bus operator to safeguard his passengers from insult and attack and whether he did so within the standard required was for the jury.

IV. It is argued the negligence of defendant, if any, was not as a matter of law shown to be the proximate cause of plaintiff's injury. We have no intention of trying to explore what defendant's brief calls "the maze of legal labyrinth" in which it is hinted the question of proximate cause has become all but lost.

The argument is that when the bus stopped and the driver departed followed by the boys, "any negligence of the defendant came to rest and a new and intervening cause was created, to wit, the actions of the plaintiff and the other passengers when they left the security of the bus and went out onto the parking where the plaintiff remained for at least two or three minutes during which period it was immediately apparent to him that a fight or scuffle was in progress at the front of the bus."

This fairly summarizes the entire argument of defendant on this point. But it does not state the situation exactly or completely as the jury might have found it. It assumes plaintiff left a place of *safety* when there is competent evidence that when he left the bus he had a reasonable right to think he was leaving a place of *danger*, created by the driver's own act. The driver himself testifies "I told them [someone on the front seat] to close the front door when I got out. * * * I wanted to keep them [the boys] there for the law. Q. In other words, you wanted to assist the police department in capturing the boys * * *? A. That's right."

The exit of plaintiff and other persons from the bus under the circumstances shown can hardly be said, as a matter of law, to constitute a "new and intervening cause." It transferred the danger from the bus to the street but it did not change the status and relationship of the parties. It may even be argued it tended to minimize the danger; but at least it was not a new one. It was the same danger from which defendant owed the "high duty" of protecting plaintiff—the duty that "stops just short of insuring the safety of the passenger," the duty "to protect the passenger as far as human care and foresight will go."

We think the question of proximate cause, along with the other issues in the case, was properly left with the jury. The judgment is affirmed.—Affirmed.

WENNERSTRUM, C. J., and BLISS, OLIVER, GARFIELD, MANTZ, MULRONEY, and HAYS, JJ., concur.

THOMPSON, J., takes no part.