ARTHUR S. NIELSEN, appellee, v. D. R. WESSELS and RALPH WILLIAM WESSELS, appellants.

No. 48807.

(Reported in 73 N.W. 2d 83)

NOVEMBER 15, 1955.

Haupert & Robertson, of Marshalltown, for appellants.

C. H. Block, of Grand Rapids, Michigan, and Harris, Van Metre & Buckmaster, of Waterloo, for appellees.

BLISS, J.—Plaintiff, a man twenty-nine years old, had been employed to pull house trailers behind a motor vehicle, identified by the U. S. Army as a quarter-ton jeep, rigged especially for that purpose, from the factory at Flint, Michigan, to various

destinations. On this trip he was pulling a 31-foot Palace Coach house trailer, eight feet wide, to Shoshone, Wyoming. On April 18, 1952, after driving since early morning, he stopped and slept a few hours just west of Waterloo, and then proceeded on his journey in the late afternoon, in a westerly direction on paved Highway No. 20 to about seven miles west of Cedar Falls. He had just come over a hill in the highway and was passing down its western slope. It was a clear day with a light breeze. The pavement was clear and dry.

On the same day defendant Ralph William Wessels, twenty-two years old, who lived at Aplington, Iowa, and was engaged in farming and general trucking, with a ton-and-a-half truck took a load of hogs, about noon, for George Kappel, a farmer near Kesley, to the Rath Packing Company at Waterloo, arriving there about three o'clock in the afternoon. On his return home on Highway No. 20, with Mr. Kappel riding with him and approximately five or six miles west of Cedar. Falls, he approached plaintiff's trailer unit and followed it for a mile and a half or two miles, on a rising grade, before he had an opportunity to pass it. Testifying for defendants, he said: "I didn't see any cars coming from the other direction. Then I honked my horn and was attempting to pass him, and I was going past him and got beside him and he kept coming over while I gradually turned off the pavement, too, with him, and by that time he hit me, and that's all I can say. I was approximately 30 feet behind him when I started honking all the time I was passing him. The trailer hit my stock rack about three feet from the front of the house trailer. My front wheels were ahead of the trailer house and beside the jeep. When the house trailer came over toward me I kept going over to the south edge to get away from him. I went way over on the grass; my outside duals were on the grass, and when the trailer hit me the duals were on the grass off the pavement. The front left part of the house trailer came in contact with the front end of the stock box at the corner. After that, I couldn't say whether there were any further collisions between the two vehicles; I couldn't really tell. I was headed for the ditch and that's about all I could tell. I felt a slight jar after that. I mean it shoved me toward the ditch. I

really don't know what happened after I went into the ditch. I ended up on top of the jeep. One wheel of my truck was sort of resting on the hood, or the seat part, of the jeep. At that time Mr. Nielsen was lying over on the shoulder. I didn't speak with Mr. Nielsen at that time, but after Foster (highway patrolman) got there and put him in the ambulance then I spoke to him some. I rode with him to the hospital in the ambulance."

Kay Brainerd was a hitchhiker riding in the jeep with Nielsen. He was in the Armed Services at the time of the trial, and was not available as a witness. Mr. Kappel also was not a witness for either party.

Continuing in direct examination, the witness, Ralph Wessels, said:

"I first became acquainted with Kay Brainerd when he was lying there by the truck. When I first talked with Mr. Nielsen, Mr. Brainerd was up there on the road by the ambulance, at the time of my conversation with Mr. Nielsen, standing right there by me. Mr. Nielsen said, 'Well, now I wonder what they will do to me.'

"Q. Was there any mention made at that time to a horn? A. Yes. As Nielsen was lying there and Brainerd was there, and he (Brainerd) said, 'We couldn't have heard a horn anyway because the jeep made so much noise they could hardly hear themselves talk in the jeep'."

This remark of Brainerd after Ralph Wessels had asked the plaintiff "if he didn't hear" him honking his horn was also testified to in the cross-examination of Wessels. Plaintiff, in his rebuttal testimony, said he did not hear Wessels ask him "if he didn't hear his horn."

Asked on which side of the black line, in the middle of the pavement, the house trailer was when it first hit his truck, the witness replied that the trailer was approximately eight inches south of the black line, and that at the time of the impact the left dual wheels of the truck were over on the green grass and dirt of the shoulder.

On cross-examination Ralph Wessels testified that the box on his truck was 14 feet long and 7½ feet wide; and: "As I was going along behind Mr. Nielsen, he was going along all right.

* * * He wasn't going too fast but going pretty good. I noticed that the trailer filled in the pavement pretty good, the whole north side of the pavement. My truck would fill up 7½ feet of the pavement. On the normal pavement where you have no edges, if both vehicles were driving right along the outside, and you were very careful, you would have about six inches between the two vehicles. There are edges or water spillways along the pavement * * * but I dont know how wide they are. * * * They are a part of the total width of the pavement. * * * I had room to pass the trailer by staying on the flat roadbed within the curbed and rounded edge of the pavement, and that is what I did. I must have been going about 35 miles an hour following him, and attempted to pass him. I was going about 40 when I got abreast of him. * * * I didn't notice anything like the rear or front end of the trailer bobbing up and down. * * * My truck was damaged at the front end mostly, and the side where it had scraped. * * * The trailer hit the box of the truck right in the front right-hand side and corner. It came in contact with the iron edge of the box. * * * I don't know how far the truck box extended over the outside of the dual wheels, or whether it was a three-inch, six-inch or a twelve-inch overhang. * * * My truck went over part of the spillway shown in the picture Exhibit 5."

There were two witnesses for defendants who saw the collision. Charles Hartgrave, a welding steam fitter in the Hormel Packing House, at Austin, Minnesota, with his wife and three children and his brother-in-law, Paul Knapp, of Shell Rock, Iowa, in his car, had been attending a funeral at Parkersburg, and about 4:30 or 5 o'clock in the afternoon were proceeding eastward on Highway 20 toward Cedar Falls. Both Hartgrave and Knapp were in the front seat.

Hartgrave testified: "There were two hills there and a valley in between them, and we were coming over this one hill (the west one) and saw this truck and jeep and trailer coming down the road towards us, in a westerly direction. The truck started to pull around the jeep and the trailer and they were side by side for some distance, I don't know how far, and then it seemed all at once that the jeep and the trailer pulled up against the truck and hit the truck and they both went off the side of

the road, and then a few seconds later we pulled up to the accident. I would say that at the point of impact, the trailer was over the middle line over toward the south side of the highway. I couldn't see that they came together more than once, but it was a sudden impact and they both seemed to cut across the road, and went down into the ditch; they may have come together more than once, I don't know. The impact couldn't have been too far from that spillway, maybe a hundred feet up from the spillway toward the hill (the east hill). I wouldn't say that the impact occurred too far south of the black line, maybe it was a foot over the line."

The witness gave like testimony on cross-examination. He said that he was about a quarter of a mile distant when he first observed the approaching vehicles, and he slowed up considerably, anticipating difficulty ahead. He did not hear a horn at any time. He said: "I didn't observe whether or not the trailer was tracking and going straight along behind the jeep as the truck attempted to pass it. I didn't observe the trailer swaying or anything. I could see that since the trailer was about eight feet wide and the truck approximately that, that they pretty well filled up the whole pavement. I don't know how far away I was; it was just that I saw the trailer and jeep hit the truck on the truck's side of the road. When the truck first came around, they were coming down the pavement side by side. The jeep and the trailer were on the north side and the truck on the south side of the road. The trailer was coming straight. I couldn't tell how far apart they were. At the distance I was away, it appeared to me they were almost touching each other. I think it was more a jackknifing, a quick turn that hit suddenly, rather than going side by side in pushing each other off. It looked to me as if there was a gradual moving over on the part of the jeep and all of a sudden there was a sharp turn and from this point on it continued going to the left. * * * I don't know what threw the trailer out of control and across the road. I don't think there was anything prior to that time in the way of weaving or swaying to indicate that it was out of control. When I actually saw the impact I was about 900 feet or so away. I couldn't observe whether or not the jeep was riding up on the

right curb at the time the truck started to pass. * * * It looked to me like the front end of the trailer hit the front end of the truck box. * * * It was quite an impact. * * * That was the only time that I saw the trailer come across the black line. * * * It appeared to me that the jeep and the trailer run into the truck. * * * I cannot say that I ever saw the truck pull into its wrong lane."

The testimony of Mr. Knapp was much like that of Mr. Hartgrave. He said: "When I say the jeep and the trailer pulled to the other side of the road, I mean they pulled to the south side. * * * When they came together the trailer house was over the black line because the truck was clear over when they hit, clear over on the south side of the road. I believe that part of the truck got off the road. * * * As the vehicles came down the hill together, I didn't notice anything unusual about their movements until the point of impact. When the truck started to go past, the trailer just kept crowding him over. The truck kept moving south. * * * The point of impact must have been at least a foot or more over on the south side of the black line. * * * I didn't at any time notice the truck get over on the north side of the paving. * * * I didn't hear any horn sounded. I was down the road quite a ways and I doubt if I could have heard a horn if it had sounded. * * * I didn't see the jeep hit the truck, but I saw the trailer hit the truck. * * * As to whether the trailer appeared to be in line with the black line and straight east and west or cornerwise, it appeared to me to be cornerwise. They were at an angle when they hit. * * * The jeep kind of went across in front of the truck and the trailer hit the truck. * * * The jeep had pulled the trailer across the line and the only way it could do that was by going across the line itself, unless the trailer jackknifed in someway. * * * The front south side of the trailer house came in contact with the front part of the north side of the truck box. The coming together was a pretty hard blow, because it made a lot of dust and jarred the truck over, and at the same time smashed the trailer. * * * When I first saw them the truck was starting to pass the trailer and at that time I was about a quarter of a mile away. I could see the truck was filling up its half of the highway and the trailer was filling up its half. There was very little distance that I could see between the two at a quarter

of a mile away. I don't think they came together before that real bad jolt that I saw, because the trailer was over and it hit the truck. The first thing I saw was that the trailer was hitting the truck."

Plaintiff, as a witness for himself, could throw little light on the cause of the collision. He was a truck driver during the twenty-nine months he served in the Armed Forces in the United States and in Europe. His average yearly mileage in truck driving after his Army discharge was between twenty and thirty thousand miles. Much of it was in pulling trailers of different types. This was his second house trailer to pull. He testified: "I was driving along on the right side of the road and I felt a jar or bump from behind, and the next recollection I knew I was upside down—I remember being upside down, and then I remember lying on the ground and a lot of people around me." He said the trailer was pulling all right that day; he had checked it every morning when he started out, and had checked it the first night at the factory, and also checked it every time he stopped for coffee along the way. He had checked it just before he started that afternoon toward Cedar Falls. He said the top speed of the jeep was 40 to 45 miles an hour and that his speed at the time of the collision was about 35 or 40 miles an hour; that he had noticed no swaying of the trailer, and that it had been pulling very easy with no trouble at all. He said that he had heard no sound of a horn prior to his feeling the jar or bump.

On cross-examination he testified: "The jeep would go 40 to 45 at the very most. I was driving it as fast as it would go. I just about had my foot on the floor board at the time. I figured we were going as fast as it would be reasonably safe. I was as far on my right-hand side of the road as possible. I couldn't have gone over further unless I pulled over on the shoulder of the road. * * * I didn't see the truck approaching from the rear. I didn't know what happened until the jar or bump. I had a rearview mirror on this jeep. I didn't know anything had happened after that until I found myself on the ground and people gathering around me. That is as much as I know about the accident. I never looked behind me at this particular time before the accident, nor in my mirror. * * * Quite a few other cars and

trucks passed me that day, and when they passed I heard their horns. My muffler did not stop me from hearing them."

John Schneider, a Highway Patrol Sergeant who had been eighteen years in the patrol service, was stationed at Cedar Falls. He was a witness for plaintiff. He testified that on hearing of the accident a call had been sent out from his station and that Patrolman Foster reached the scene of the collision that afternoon before he did and was giving Nielsen first aid. Both Nielsen and Brainerd, who was not injured much, were taken in an ambulance to Cedar Falls. He said that the highway at the place of the collision ran in a straight easterly and westerly direction with no curve. The vehicles involved were about five or six hundred feet west of the top of the easterly hill. The width of the pavement including the ten-inch curbs or gutters along each edge was eighteen feet. Deducting the twenty inches of curbs left the width of the flat paving sixteen feet and four inches. He found the jeep in the ditch with the Studebaker truck on top of it, and the trailer was lying on its side in the ditch about 44 feet farther west. All were on the south side of the road. He took some measurements and found the jeep and the truck went off the paved portion of the highway approximately 200 feet up the road (east) from where they lay in the ditch. There were no skidmarks indicating where they had gone off the paving. The only mark available was where the trailer had turned on its side and slid.

On cross-examination, without objection, he was asked: "As you stood there that day, could you determine where the point of impact was? A. No, I couldn't positively identify it. There was dirt and debris knocked around, yes. I would say, from my own observation, personally, it was on the south side of the center line." He further stated: "The dirt and debris I found there was located on the south side of the center line. The dirt and debris consisted of dirt from the undercarriage of the truck and splinters from the trailer itself. These were all located on the south side of the pavement. Since the truck was passing, the debris would be on the truck's side of the paving so to speak. I would say that the debris was located probably a foot south of the center

line of the pavement. The dirt and the debris was just scattering and on the impact had dropped off on the truck side of the road. Starting from the point of the impact and going on down to where the jeep and the truck came finally to rest, the jeep and the truck went practically straight and the trailer jackknifed and broke loose and slid forward on its side onto the shoulder. The two hundred feet that the truck and jeep traveled was all on the south or truck's side of the paving. When we examined the debris on the south side of the highway, I also examined for tracks on the shoulder, off the paved portion of the highway, at about that same point. At that point, directly across from the debris and dirt, we found the tracks of the truck and the jeep where they went out on the grass and on the shoulder."

The witness testified that during his eighteen years of service with the Highway Patrol he had investigated quite a number of accidents, and had been trained to determine the point of impact thereof, and to study the track marks left by the vehicles, for the purpose of making an accurate report on how the accident happened.

The witness was then asked on cross-examination by defendants: "Then, in this case, as you stood there that day on April 18th and saw the truck tracks made by the tires off the pavement and saw the debris collected on the truck's side of the paving, was it possible for you that day to determine where the truck was when the accident happened?" Objection was made that the question called for an opinion and conclusion of the witness, and not for a statement of fact, and if he was qualified as an expert he could testify as to what he observed, but not as to how the accident happened. The objection was sustained.

The witness also testified that: he saw marks where the trailer had gone over on its side, where they first appeared on the south or truck's side of the highway, and also marks on the side of the trailer itself; that when the trailer skidded it skidded west and south and went off the paved portion of the highway on the south side.

.....The question just above to which objection was sustained was again asked the witness, and the previous objection was again made. The court sustained the objection, but permitted

the witness to give a "yes or no" answer, and he answered in the affirmative.

The witness was then asked: "Was there anything that you saw or observed there that day that caused you to believe that this accident occurred upon the north side of this highway?" Objection was made that it called for an opinion and conclusion and not a statement of fact, and to the very matter in controversy and invaded the province of the jury. The ruling was: "The Court will sustain the objection to that, but we will go into it outside the hearing of the jury."

The examination continued in the courtroom as follows: "Q. Did you see anything on the north side of the highway that led you to believe that any collision had occurred that day on the north side of the highway?" Plaintiff's renewal of his previous objections to like questions was overruled. The witness answered: "I could see no accident there that day. Q. Nor the results thereof? A. That's right. Q. That is, on the north side of the highway? A. That's right." Defendant moved to strike the answer of the witness because of no opportunity to object, and then renewed his previous objections. The ruling of the court was:

"The statement that he observed no accident may go out.

"Mr. Robertson: That's all right. That's all."

On redirect examination the witness, Mr. Schneider, testified that: when he saw the trailer and jeep go by his patrol office in Cedar Falls he did not notice anything unusual about the way it went along; it was trailing perfectly at that time; some 200 feet east of where the truck and jeep were lying after the collision "was a mark going off the pavement. It was a tire track in the grass. There was no mark on the pavement itself. That was the first place that I observed the mark in the grass and it was a continuous mark to where the jeep and the truck were found. That was one set of wheel marks leading right up to the truck * * *. That was approximately a foot and a half to two feet south of the pavement * * *. These marks led directly to the truck. We didn't observe any dual wheel marks any farther east of that point. We looked the situation over and the reason we knew these marks were made by the truck was because they led directly to the truck. They were dual wheels. All I know is what I ob-

served there and I observed dual wheel tracks first on the grass. The marks made by the trailer were not tire marks but were made by the side of the trailer. The dirt that I saw on the pavement was dry, powdery dirt that had been caked and dropped. This trailer was made of aluminum." Pieces of aluminum and insulation and splinters from the frame of the trailer were scattered along the road for quite a distance. "They commenced at approximately 18 or 20 feet west of where I first saw the dual wheel marks over on the grass."

On re-cross-examination the witness testified: "The debris was located on the south side of the highway some 20 feet west of where I first saw dual wheels in the grass off the paved portion of the highway."

At this point in the examination of the witness, the Judge, attorneys, reporter and witness retired from the courtroom to the court chambers. Defendants' attorney repeated the question asked in the courtroom, whether from his training and eighteen years of experience "it is possible for you in this instance to determine upon which side of the highway this accident occurred." The witness answered: " I think I could." Objection was made to this offer of proof for all the reasons previously stated in the courtroom, and for the additional reasons that there had been no foundation laid for the question, and it was not within the province of expert testimony.

The witness was then asked: "In your opinion, on this day on which side of the highway did this collision occur?"

The witness answered: "On the south side." Plaintiff, after the answer, renewed his objections to the offer for all reasons previously urged in open court, "and here while the offer is being made." The record shows no ruling on the objection.

The witness was then asked the following question by defendants:

"Now, Sergeant Schneider, on this 18th day of April, 1952, as you stood there on the highway and examined the scene of this collision, did you find anything on the north side of the highway that indicated to you that an accident had occurred there? A. I answered no." Plaintiff renewed his objections previously urged, and for the additional reason that no foundation had been

laid for the question, and "it is an opinion; it is just worded in another way. He has to reach the conclusion. It is a negative thing, just the opposite of the affirmative one. You asked him if it indicated, and that's the point where I objected what it indicates.

"The Court: I have sustained the objection. Did you see anything on the north side in the way of debris or dirt, is a legitimate question, but hasn't that been asked and answered? * * *

"Mr. Buckmaster: He asked him if he saw any debris on the north side and I didn't object to that. * * * The question has been asked and answered if there was any debris on the north side and he has stated that there was not."

The court and the counsel then returned to the courtroom where there was no further interrogation of witness Schneider.

We have set out the evidence quite fully and in considerable detail because it is our conclusion that the factual matters are determinative of this appeal. The evidence is by no means one sided.

I. Plaintiff alleged five grounds of negligence on the part of defendants, to wit: (1) failure to have the truck under control; (2) failure to keep a proper lookout; (3) failure to operate the truck at a safe distance to the left in overtaking and passing plaintiff's vehicles, in violation of section 321.299 of the 1950 Code of Iowa; (4) failure to give an audible passing signal; (5) in traveling at a dangerous and excessive rate of speed in the existing circumstances.

Defendants' errors assigned for reversal are 1, 2 and 3 respectively in overruling each motion to direct a verdict for them, and their motion for judgment notwithstanding the verdict; 4, in overruling their objection to plaintiff's closing argument; and 5, in refusing to permit the opinion testimony of Patrolman Schneider.

II. It is undisputed that the pavement was 18 feet wide including the 10-inch strip of rounded curbs or flanges on each side, leaving a flat strip of pavement between them 16 feet 4 inches wide, or 8 feet 2 inches on each side of the center line of the pavement. Each operator said he was driving on his half of

the flat surface and not on the curb. The plaintiff's trailer was 8 feet wide and the south side of it would come within two inches of the center line of the pavement. The box on defendants' truck was 7 feet 6 inches wide and if the truck was being driven along and within the south curb of the pavement, the north side of its box would be 8 inches from the center line of the pavement and 10 inches from the trailer.

III.   The driver of the truck had been following plaintiff for a mile and a half or more but could not pass him on the long hill, but decided to do so as he reached the top of the hill. From this point he had a clear view to the west for a long distance. Five or six hundred feet westward from the top of the hill there was a culvert across the pavement, at each end of which was a flanged concrete spillway extending some feet across each shoulder. At the spillway at the south or defendants' side of the pavement some concrete was visible above the shoulder at its outer side, and that was true on the north side. In each spillway was a post with apparently light reflectors on each. He testified that he looked to the west and saw no vehicles coming toward him. He either did not look, or looked carelessly, for approximately a quarter of a mile away the car of Mr. Hartgrave, in plain view—the day was clear—was approaching in the defendants' lane. Its occupants saw the vehicles of both parties from the top of the hill until they crashed in the ditch on the south side of the pavement.

The evidence was such as to raise a jury question that defendant-driver failed to keep a proper lookout. The duty to keep a lookout includes the duty to see what was in plain sight. Holderman v. Witmer, 166 Iowa 406, 410, 147 N.W. 926; Ege v. Born, 212 Iowa 1138, 1143, 1144, 236 N.W. 75.

IV.   We will consider grounds of negligence (1) and (5) together. Defendant had been following plaintiff for some time and no doubt observed something of his traveling speed. It was a heavier outfit than his and would have much greater momentum than his empty truck down the inclining road ahead. He must have known something of the speed of his own truck. He drew abreast of the trailer unit, which was probably 40 feet

long, at a speed of 40 miles an hour. Plaintiff's vehicles were traveling at approximately the same speed. They traveled for several hundred feet in this manner. Mr. Hartgrave thought the initial impact was about 100 feet east of the spillways. Then they reached the spillways, and defendant said he went over the south one at the culvert "where the accident happened." Under conditions that should reasonably have been apparent to him, he was negligent in placing himself and the plaintiff in dangerous positions by operating his truck without proper control or speed. The record fairly shows both allegations of negligence were jury questions. It must have been apparent to Ralph Wessels that his truck and the trailer for all practical purposes would completely cover the pavement, leaving but a few inches between them if he attempted to pass on the pavement, and that the spillways and posts would interfere with the vehicles of either one in getting on the shoulders.

V. The conditions and conduct of defendant Ralph Wessels, set out just above and in our statement of the evidence, were such that plaintiff's allegation that he violated section 321.299 of the 1950 Code of Iowa was an issue of fact for the jury.

VI. Plaintiff failed to sustain the charge that defendant-driver did not give an audible passing signal, and he did not deny the undenied admission of Mr. Brainerd, made in his presence, that the jeep was making so much noise that the honking of an automobile horn could not have been heard.

VII. We find no reversible error in the overruling of defendants' objection to the closing argument of plaintiff's counsel when the latter used a toy tractor and trailer to illustrate points to the jury. The propriety of so doing was largely in the discretion of the trial court. Plaintiff cites in support of his contention the following authorities: Tashjian v. Boston & Maine Ry., 1 Cir. N. H., 80 F.2d 320, 321; Hoffman v. Bloomsburg & S. Ry. Co., 143 Pa. 503, 22 A. 823; 53 Am. Jur., Trial, section 490, page 395; 88 C. J. S., Trial, section 177, page 348; and Goldstein, in his book "Trial Technique" (1935) section 651, page 609, where he suggests, "One method usually employed in the attempt to picture the happening of an accident is through the use of models, or where no models are available, through the use of

the hands. This would be particularly true in an automobile collision case. * * *.

VIII. With respect to defendants' challenge to the ruling of the court in not permitting Highway Patrolman Schneider to answer, as an expert, the opinion question propounded to him on cross-examination, we may say, without so ruling, that the court might well have permitted him to answer, whether the witness be considered to be an expert or nonexpert. The ruling on the objection was largely in the discretion of the trial court. Waterloo Savings Bank v. Waterloo, C. F. & N. R., 244 Iowa 1364, 1374, 60 N.W.2d 572, 578; Knaus Truck Lines, Inc. v. Commercial Freight Lines, 238 Iowa 1356, 1367, 29 N.W.2d 204; Ruth v. O'Neill, 245 Iowa 1158, 1171, 1172, 66 N.W.2d 44, 52.

As we said in Grismore v. Consolidated Products Co., 232 Iowa 328, 344, 5 N.W.2d 646, 655:

"The general rule for the admission of opinion testimony, whether it be lay or expert, may be briefly stated thus: An expert's opinion is received because and whenever his knowledge of the subject matter is greater than the jury's, and aids them or is proper or essential to their information, while a lay or nonexpert opinion is received because and whenever the facts cannot be told so as to give the court or jury the information which the witness' observation has given to him, or when it is impracticable for a witness to state all of the many details which go to make up the mental and optical picture which he observed, so as to enable the jury to see what he saw."

Whether the question objected to was a proper one is immaterial, under the record, and we need not pass upon it. There were several questions objected to, all of which were of the same type, calling for the witness' opinion as to where the point of impact between the trailer and the truck was, whether on the north or south side of the center line of the pavement. The adverse rulings of the court were without prejudice to the defendants because the witness had previously been asked, without objection, this question: "As you stood there that day, could you determine where the point of impact was?" He answered, with-

230 out objection: "I would say, from my own observation, personally, it was on the south side of the center line" (pages 11, 12 of printed record).

IX. The question of whether the negligence of the plaintiff or of defendant Ralph Wessels was the proximate cause of the collision was a question for the jury. The testimony of the plaintiff, alone, that at the time of the impact he was driving along on the right side of the road, as far on his right-hand side of the road as possible, without going over on the shoulder of the road, was substantial testimony of such character as to require the submission of the issue to the jury. Believable evidence and justifiable inferences favorable to plaintiff must be accepted at their face value in determining whether he made a case submissible to the jury. As said in Murray v. Cedar Rapids City Lines, Inc., 242 Iowa 794, 800, 48 N.W.2d 256, 260: "But the question remains one for the jury, where there is testimony to appraise." In O'Hara v. Chaplin, 211 Iowa 404, 408, 233 N.W. 516, 519, we said:

" 'So it is for the jury to determine as to the weight of the evidence, though there be one witness testifying on one side to certain facts, and many witnesses on the other side testifying to a contrary state of facts. It is not the province, in such a case, of the court to pass upon the credibility of the several witnesses, and to say which one told the truth, or that the story of one is more likely to be correct than that of another.' "

We have many times so held, and further citation of authorities is unnecessary. The judgment is—Affirmed.

All JUSTICES concur except PETERSON, J., who takes no part.